The motion to dismiss the writ of error is overruled.

---

## NEW YORK SUPERIOR COURT.

ALONZO F. ROBBINS AND HENRY D. SANGER agt. RICHARD E. MOUNT, JR., CORA MOFFAT AND MYRA MOFFAT.

In an action against the *executors* and *infant devisees*, as owners of real property, for damages by reason of an injury caused by negligence, in an overflow of water from a basin or fixture constructed in the building, the executors are not liable where they took no estate in the lands, their authority being a mere naked power to receive the rents, determinable at any time, upon the appointment of guardians for the infant devisees; they neither having placed the fixture in the building, nor maintained it there; neither had they any active or passive agency in producing or contributing to the injury.

The *infant devisees* were not responsible by reason of any negligence by them personally, or having caused the injury by their direction or authority—no such facts appearing.

An *infant* is incapable in law of appointing an *agent*. He cannot appoint an *attorney;* nor sue or be sued, except by next friend or guardian. He is not liable on contract, and generally has no legal capacity to act for himself. But such legal incapacity does not exempt him from the consequences of his *tortious acts*. In respect to those, he is held responsible, if *doli capax*, when the wrong is done. But such tortious acts must be committed by the infant *himself*, or under his immediate view, or by his directions or authority. Being incapable of appointing an agent or servant, he cannot delegate powers to another, nor can he guarantee or insure the fidelity, care or skill of another.

In the case of *infants*, the principles of *respondeat superior*, of principal and agent, and master and servant, cannot be applied.

A *contract* upon which an *infant* is not liable, cannot be turned into a *tort* for the purpose of charging him.

*Infant devisees* can neither appoint an agent of the estate, or a janitor of a building thereon ; and if such appointments were made, it would impose no liability upon such devisees for any negligent act of the employees.

Where the occupant of an office in a building, has no conditions in his lease that he shall employ such janitor or persons as the landlord may select for the whole building, for the purposes of cleaning and keeping his office in order, and making fires, and such persons are employed by the occupant for such purpose, and for which he pays them, they become his agents and servants, and

Robbins agt. Mount.

for any injurious acts to others, arising from their negligence while thus employed, the landlord is not liable.

Although *circumstantial evidence* may be sufficient to prove a particular act of *negligence*, it must be of such a character as to lead directly to the conclusion that some *designated* person was in fault.

If the facts are such as would render an *adult* owner of real estate liable under a proposition that if the fixture upon such property was improperly constructed, or should not have been there at all; or if all safeguards which could possibly be placed there, should have been placed there; *it seems*, that such liability would also attach to *infant* owners.

It is doubtful whether the principle in that class of cases, which hold that owners are responsible as *insurers*, without regard to the question of negligence, apply to questions arising between *landlord and tenant.* The relation between the latter is founded on contract.

There can be no implied contract of warranty on the part of a landlord, that the building shall continue fit for the purposes for which it was demised; there being no covenant to repair. Nor an implied covenant of warranty that the premises are in a tenantable condition.

Where the *fixture* erected and maintained upon the premises, is not *unlawful,* and is not *per se* a nuisance; in an action for damages, for injuries caused by its use, the question of *negligence* becomes material.

The *owner's* liability then, rests upon his *misfeasance* in constructing an unsafe fixture, the insecurity of which caused the damage.

The negligence of the party injured, contributing to the injury, will defeat a recovery, however negligent the other party may be; so will the concurrent negligence of a tenant of another portion of the building, defeat an action against the common landlord.

If the fixture complained of, was suitable and safe, if used with care, no responsibility can rest upon the owner; and if by its negligence or careless use, it is made to cause an injury, the person guilty of such negligence must be looked to for damages.

The whole duty of owners towards their tenants is discharged, if the water fixtures in their buildings are so constructed that in their careful use, they perform the purposes of their construction. They do not warrant or insure against their negligent use, and are not liable merely because some person, for whom they are not responsible, turned a faucet, or negligently left it open.

*Heard February General Term, 1867.*

*Before* MONELL, GARVIN *and* McCUNN, *Justices.*

APPEALS from orders made at special term denying motions for a new trial.

The action was to recover damages for injury to plaintiffs' property by water. They occupied, as tenants, the first floor of the building on the north-west corner of Broadway and Worth street, in this city. The upper parts of said building were occupied as offices; one of said parts, being upon the second floor, was occupied by George Gifford, as a law office. The building was formerly owned by William

B. Moffat, who died in April, 1862, devising his real estate to the defendants Cora and Myra Moffat, then and now infants.

The defendant Mount, was appointed and qualified as executor. The only authority, if any, given by the will to the executor, over the real estate, was in the following clause : " I hereby authorize and empower my executors hereinafter named, to collect and receive the income and rents of all my real estate, for the benefit of those entitled to the same."

The plaintiffs had possession of the first floor of said building, under a lease from William B. Moffat, the devisor of the defendants Cora and Myra Moffat, dated in March, 1861, for the term of four years from May 1, 1861. The rooms occupied by Gifford, were held under a lease made in February, 1863, by Smith, the agent of the estate of said William B. Moffat, for one year from May 1st, 1863. These rooms, which were directly over the store of the plaintiffs, contained a *urinal*, constructed when the building was erected, for the use of those rooms. Such urinal contained a stop-cock above it, and was perforated with several holes in the bottom of the basin, for the outflowing of the water.

One Anderson, was trustee for the Moffat children, and was employed by the defendant Mount, to collect the rents. One Grevatt, was the " janitor " of the building, employed by Mr. Moffat in his lifetime, whose business was to take care of the building, clean the passages, and let the tenants in and out. He was employed by Gifford to sweep and dust his office, and had a key to the door opening from the hall. He slept at the head of the stairs, on the floor where Gifford's office was.

Grevatt testified, that on the night of the 9th of April, 1864, he was up until after twelve o'clock. The next day, which was Sunday, between one and two o'clock in the afternoon, he heard the running of water in Gifford's room; went there and saw the water flowing over the basin of the urinal. There was a small stream running through the stopcock. He shut off the water, and took out of the urinal at

that time, tobacco leaves of a cigar, and a little piece of paper spread out, just covering the holes in the bottom of the basin. He employed a woman to assist in cleaning the offices, making fires, &c. He stated that he went into Gifford's rooms on Saturday evening and prepared the fires for lighting, and then let the woman in to do the cleaning.

The evidence which it was claimed tended to prove negligence, was that Grevatt, the janitor, and the woman employed by him, were in Gifford's offices to clean the same, after Gifford and his clerks had left, on Saturday evening. When the last clerk (Biggs) left, he stated that he had occasion to go into the water closet, and that the stop cock and urinal were in good order. Two of Gifford's clerks had keys of the office ; another key was sometimes left hanging in the office of Anderson, the agent, by the janitor. The janitor, or the woman in his service, was, according to the evidence, the last person in Gifford's office on Saturday night. There was no evidence that either of these opened the stop cock, or left it open, and it was not known how or by what means it came to be opened and to be left open. It was *supposed* that some person had opened the stop cock to obtain a flow of water into the urinal, and failing to obtain such flow, had negligently or thoughtlessly left it open. There was evidence that the supply pipe connected with the mains in the street, and that the water did not always rise to the second story of the building. The evidence failed to show who had left the stop cock open, and it was conjectured merely whether it was done by the janitor or the woman.

To *connect the defendants* with such negligence, it was proved that Grevatt, the janitor, was employed by Moffat in his lifetime, and afterwards by the estate, to keep the house clean, as janitor of the building, to sweep the passages, and other duties in the agent's office. He employed a woman to assist him in cleaning. He had a key of Gifford's office, and was employed by him to sweep the office and dust it, wipe up the floor, and, in the winter, to take charge of the fires and ashes. There was also some evidence that a short

time previously water had run down into the plaintiff's store from a water closet above, and the plaintiff sent for Anderson, the agent, and he promised it should not occur again.

The improper or insufficient *construction* of the urinal consisted in its not having an overflow, so that if the holes at the bottom were closed with paper, or anything, the water would flow through the holes in the top; also, in not having a "safe," with access to the pipe connecting with the waste pipe, so that if the urinal overflowed, the water could run from that pipe into the waste pipe.

Some witnesses testified that the perforated holes at the bottom were sufficient, if unobstructed, to carry off a continuous flow of water from the supply pipe. Others testified that such holes were not sufficient for such purpose. But all the witnesses agreed that there could not be an overflow if proper precaution was taken to turn the stop cock after it had been used, so as to shut off the water.

A motion was made to dismiss the complaint as to all the defendants.

The court granted the motion as to the defendant Mount, and the plaintiffs excepted. The motion as to the other defendants was denied, and they excepted.

After evidence on the part of the defendants, the justice submitted the case to the jury in two aspects.

He charged, *first*, that if the overflow was caused by the *negligence* of the defendants, they were liable; and, *second*, that if the jury believed that the urinal, with its draw cock, was constructed *improperly*, or should not have been there at all, or that the safeguards that could possibly be placed there should have been placed there, and they believed that it was unsafe, they would be justified in finding for the plaintiffs, even if they should find that the defendants or their servants were not the immediate cause of the damage.

The defendants requested the court to charge that there was no legal evidence to make the defendants liable; that they were not liable for the act of any person who, without their authority or assent, entered Gifford's apartments and set the water running, and that there was no evidence that

any person did go with their authority or assent; that it was no part of the duty of the janitor towards the defendants to inspect the urinal or stop cock on the premises of Gifford; that if the urinal and stop cock were so constructed that an overflow could not be caused, except by the negligence of some person who failed to close the stop cock when it should be done, such negligence did not make the defendants liable, unless it was the act of some person acting with their authority and consent; and that if the urinal was properly constructed at the time of its construction, and continued to be sufficient with ordinary care and prudence, the landlord was not liable, because he did not from time to time adopt new improvements and additions.

The justice refused to charge as requested, further than he had already charged.

The defendants excepted to the charge and refusals to charge.

The plaintiffs had a verdict.

A motion was made by the plaintiffs, at the special term, upon a case and exceptions for a new trial against the defendant Mount, which was denied.

A motion was also made by the defendants Cora and Myra Moffat, at special term, upon a case and exceptions for a new trial as to such defendants, which was also denied. Each party respectively appealed from the orders denying said motions for a new trial.

The appeals were heard together.

D. D. FIELD, *for plaintiffs.*
J. T. BRADY, *for defendants.*

*By the court,* MONELL, J.   William B. Moffat, by his will, devised his real estate to his two infant daughters, the defendants Cora and Myra Moffat.   The devise was in fee simple absolute, without condition or limitation.   Upon the death of the testator, the devisees became seized, as tenants in common, and entitled to the rents and profits.   Until the appointment of guardians of their estates (2 *R. S.* 150, §§ 3,

10; *Vail* agt. *Vail*, 4 *Paige*, 317; *Bradley* agt. *Amidon*, 10 *Id*. 235), the duty of collecting and receiving such rents and profits was imposed by the will upon the executors. But the executors took no estate whatever in the lands, their authority being a mere naked power to receive the rents, determinable at any time upon the appointment of guardians. (*Cases supra*.)

The action, therefore, was not maintainable against the defendant Mount as owner, in either of the aspects in which the case was given to the jury. He neither placed the fixture in the building, nor maintained it there. Nor does he seem, from the evidence, to have been the active or passive agent producing or contributing to the injury. The owner of real property may be liable for defective construction of his buildings or their appurtenances, without any immediate or active agency in the injury; but such liability is confined to the owner, and does not extend to agents, employees or servants of the owner.

There was no error, therefore, in dismissing the complaint as to the defendant Mount, and the order denying a motion for a new trial as to him should be affirmed.

The case against the infant defendants was put to the jury upon two grounds: *First*. If the overflow was caused by the *negligence* of the defendants, they were liable; and, *Second*. If the fixture was *improperly constructed*, or should not have been there at all, or if all the safeguards that could *possibly* have been placed there were not placed there, and the fixture was unsafe, the defendants were liable.

Upon the first proposition, it was not pretended that any act of negligence by the defendants *in person*, or by their direction or authority, caused the injury; but it was claimed that the rule of *respondeat superior* applied, and that they are responsible for the negligence of their agents.

If this case depended upon ordinary principles applicable to principal and agent, or master and servant, and there was any evidence of negligence, it was proper to submit such question to the jury. A person capable in law of being a principal or master, renders himself liable for the want of

skill or care of his agent or servant, the relation between such persons being upon the principle of *agency*. (*Story on Agency*, § 308 ; *Facit per alium, facit per se.*) An infant, however, is incapable in law of appointing an agent (*Story on Agency*, § 6). He cannot appoint an attorney (2 *R. S.* 446, § 2), nor sue, or be sued, except by next friend or guardian (*Code*, § 115). He cannot hold a civil office (1 *R. S.* 116, § 1 ; *People* agt. *Dean,* 3 *Wend.* 438), is not liable on contract, and generally has no legal capacity to act for himself. Such legal incapacity, however, does not exempt him from the consequences of his *tortious* acts. In respect to those, he is held responsible, if *doli capax* when the wrong is done. But such tortious acts must be committed by the infant *himself*, or under his immediate view, or by his direction or authority. As he cannot create an agency, he cannot appoint a servant, and, therefore, cannot delegate powers to another ; nor can he guarantee or insure the fidelity, care or skill of such other.

The foundation of the rule *respondeat superior* is, that the principal holds out his agent as competent and skillful, and fit to be trusted, and thus in effect warrants his fidelity and good conduct in all matters within the scope of the agency.

An infant being incapable of contracting, cannot warrant the competency or skill or care of a person with whom the relation of agent cannot exist. To apply the rule, therefore, there must be an agency, and the act must be within the scope of the agency ; if not, the principal is not liable (*Paley Ag.* 298). So, if the act be willful, the principal will not be responsible, unless it be within the general scope of authority (*Weed* agt. *Panama R. R. Co.* 17 *N. Y. R.* 362). All these rules necessarily include both the right and *power* to constitute the relation of master and servant. Such relation exists only in *contract,* and requires the same capacity in the contracting parties as in the formation of any other agreement. If either is incapable of contracting, there is no mutuality, and neither is bound (*Cooke* agt. *Oxley,* 3 *T. R.* 653).

The result of this review of the principles of agency is,

that the liability of principals for the negligence or other misconduct of their agents arises from the express or implied authority of the latter and the implied guaranty of the former, and has its foundation in the *contract* which creates the relation, and by which it is implied that persons shall not suffer by the negligence of those he employs (*Reeves' Dom. Rel.* 3 ed. 519).

In the case of infants, these principles cannot be applied. He cannot in law become a master, or be responsible as a master for the negligence or want of skill of his servant.

In England he cannot be an innkeeper, so as to be charged on the custom of the realm for negligence. ( *Bac. Abr. tit. Infancy, e.*) Nor can he be a trespasser by prior or subsequent assent, but only *for his own act.* (*Co. Lit.* 180, *h. n.* 4.) He is not responsible even for his own act, if it occurs through his unskillfullness and want of knowledge, discretion or judgment (*Campbell* agt. *Stokes*, 2 *Wend.* 144), and a contract upon which he is not liable, cannot be turned into a tort, for the purpose of charging him. (*Jennings* agt. *Rundell*, 8 *T. R.* 335 ; *Munger* agt. *Hess*, 28 *Barb.* 75.)

The defendants in this case, could not appoint either Anderson as agent of the estate, or Grevatt as janitor of the building. Such appointments, had they been made, would have imposed no liability upon the defendants for any negligent act of the employees.

But there is no evidence that either the agent or the janitor, received his appointment from the defendants. Anderson collected the rent for Mr. Mount, the executor, and Grevatt, the janitor, was continued in service by the estate.

The case, therefore, fails entirely in connecting the defendants with any person, for whose unlawful act they can be held responsible. The only person suspected of having let the water on (either the janitor or the woman employed by him), was not the agent or servant of the defendants.

But furthermore, if they were the agents of the defendants, their authority did not extend over Gifford's apartments. Grevatt testified, that he was employed to take a general superintendence of the house, to see that the halls

were kept clean, and the outer door closed.   He was employed by the occupants of rooms to clean and make fires.   Gifford employed him, and he had access to Gifford's office, by his authority and consent.   There was no condition in Gifford's lease that he should employ such persons as the landlord might select, and Grevatt, therefore, by virtue of his employment, became the servant of Gifford.   The services of the janitor, according to all the evidence, was confined, as respected the landlord, to the halls and outer door of the building.   For any services in the apartments of tenants, he was employed and paid by them.

The evidence, therefore, coupled the person, whom the jury, it seems, inferred had produced or contributed to the injury, with Gifford, and not with the defendants.

But more than this.   I think the evidence of negligence was not sufficient to go to the jury.

The burden of proof was on the plaintiffs, and although circumstantial evidence may be sufficient (*Holbrook* agt. *Utica and Schen. R. R. Co.* 12 *N. Y. R.* 236), it must be of such a character as to lead directly to the conclusion that some *designated* person was in fault.   It is not pretended that the proof in this case shows or points out the person by whose neglect the water in Gifford's office was left to flow. It was not shown whose hand turned the faucet, nor whose omitted to shut the water off.   That it was the janitor or the woman, was mere supposition and conjecture.   The only circumstance at all tending to such conclusion, was that the former went into Gifford's rooms to prepare the fires for lighting, and afterwards let the woman in to clean.   There was quite as much reason to suspect or conjecture that Mr. Gifford or one of his clerks, had left the faucet open.   The urinal was for the exclusive use of Gifford's offices, and the woman was directed to obtain water for cleaning from another part of the building.   The pipe to which the stop-cock was attached, received its supply of water from the street main. It was proved that the water would not always rise to the faucet, owing to the lack of supply in the distributing reservoirs, and that sometimes it would not run at all.   It was

·quite possible that one of Gifford's clerks, desiring to rinse the basin, may have turned the faucet, and the water failing, left it open; and its condition would not attract attention, or excite observation.   Besides, I think, the proximate cause of the overflow was as much the tobacco leaves and paper, which had negligently been thrown into the basin, as the omission to shut off the draw-cock.   Some of the witnesses, especially Biggs, one of Gifford's clerks, who examined it daily, having testified that the holes at the bottom, if unob- . structed, were sufficient to discharge all the water from the supply pipe, even if left continually running.   Biggs further testified, he was the last person who left the office, and that he examined the urinal, and it was in good order, and that the faucet was shut off.   If, however, the water did not flow, and the pipe emitted no sound, the clerk's attention would not probably be called to the condition of the faucet, and he merely said on his cross-examination, that it was in order.

It seems to me the evidence failed to designate the agent whose act occasioned the damage, and that the jury could not conscientiously say, it was the janitor or the woman, there being evidence that it might have occurred through the fault of another person.

The second proposition of the learned justice was, that if the fixture was improperly constructed, or should not have been there at all; or if all safeguards which could possibly be placed there, should have been placed there, and the jury believed that the urinal was unsafe, the defendants were liable.

If the facts were such as would render an *adult* owner liable under this proposition, I am inclined to think such liability would also attach to *infant* owners.   The liability in either case rests, if it has a foundation at all, upon the maxim *sic utere tuo*, &c., and not upon any contract or obligation implied from the relation of the parties.

The principle laid down by the learned justice, follows in its scope, that class of cases where owners are held responsible as *insurers*, without regard to the question of negligence.   (*Dygert* agt. *Schenck*, 23 *Wend.* 446 ; *Congreve* agt.

*Morgan,* 18 *N. Y. R.* 79 ; *Id.* 84 ; *Davenport* agt. *Ruckman,* 10 *Id.*)

In all the cases cited, it was held that any use of a public highway or street for private purposes, was *unlawful,* and, therefore, any obstruction placed upon it, or anything done below the surface, which rendered its use hazardous, was a *public nuisance,* and any person constructing or continuing such nuisance, was responsible to the public, and to individuals receiving special damage therefrom.

Those decisions were predicated upon the *unlawful* use of the *highway* by individuals, for their private purposes, and the liability was fixed without regard to the care and skill bestowed in erecting the obstruction. If an injury occurred, it was the *fault* of the individual who had caused the nuisance ; and no prudence, care or skill, or perfectness in construction or finish, or effort to render it safe, would excuse the fault. As was said in *Davenport* agt. *Ruckman* (*supra*), a person making openings in the highway for his private use, is an *insurer* of all persons who pass over the opening, however carefully protected.

I think it may be doubted, however, whether the principle of those cases apply to questions arising between landlord and tenant. The relation between such parties, is founded on contract, and there cannot, in general, be an implication of duty or obligation, upon which a responsibility can attach. Hence, there can be no implied contract of warranty on the part of the landlord, that the building shall continue fit for the purposes for which it was demised, there being no covenant to repair, (*Howard* agt. *Doolittle,* 3 *Duer,* 464), nor implied covenant of warranty that the premises are in a tenantable condition. (*Cleves* agt. *Willoughby,* 7 *Hill,* 86.)

All analogy between the cases referred to and the one at bar, is lost in the fact that the fixture erected and maintained upon the premises was not *unlawful,* and was not *per se* a nuisance, and, therefore, the question of negligence becomes material.

The owner's liability then, rests upon his *misfeasance* in

constructing an unsafe fixture in another part of the premises, the insecurity of which caused the damage.

It was not wholly a question whether the contrivance was suitable for the purpose intended, nor whether it was positively safe. Persons might differ as to both points, and there is no principle which admits a liability for a mere partial or temporary unfitness, without express negligence. But the question was, whether under all circumstances, at all times, with the aid of ordinary skill, and the exercise of ordinary care, the fixture was dangerous. The negligence of the party injured contributing to the injury, will defeat a recovery, however negligent the other party may be. So will the concurrent negligence of a tenant of another portion of the building, defeat an action against the common landlord.

The fixture complained of, was put in the building when it was erected in 1852, and had remained there without alteration, down to the accident, without injury to any one. It was constructed with a basin five inches deep in the centre, and a foot in diameter on the top, perforated with five or six holes. Above it was a supply pipe, with a stop-cock to shut off the water after using it to rinse or cleanse the basin. There was a difference among the witnesses whether the holes in the bottom of the basin would discharge all the water, if the supply was kept continually running. Biggs, whose knowledge was experimental, said they would if unobstructed. Other witnesses were of opinion they would not. The construction of the fixture was criticised by several experts, some of whom objected that it did not contain an overflow, and others, that it did not contain a supplemental floor of zinc or lead in the basin, inclining towards the waste pipe. *But all the witnesses agreed that if proper precaution was taken, and the stop-cock was turned off, there could not be an overflow, and that an overflow could occur only by leaving the stop-cock turned on.*

Thus, according to all the evidence, the urinal was suitable, sufficient and safe, if it was used with care, and it became unsafe only if it was used without care.

One of the requests to charge, that if the urinal and stop-cock were so constructed that an overflow could not be caused *except by the negligence of some person who fails to close it*, the defendants would not be liable, it seems to me, was correct and eminently proper.

I have already endeavored to show that the owners were not insurers, or liable at all events, without regard to their negligence. If I have succeeded, then it follows that they are liable only for negligence, and such I understand to be the doctrine in *Eakin* agt. *Brown* (1 *E. D. Smith*, 36), where Judge WOODRUFF says : "If the injury result from the *negligence* of the owner, either in constructing or upholding the freehold, he is responsible ;" but he adds, "if it result from the negligence of the tenant *in any manner*, he is liable."

The liability of carriers of passengers, rests as well on contract as for negligence (*Weed* agt. *Panama R. R. Co.* 17 *N. Y. R.* 362) ; and a breach of a contract may result from negligence.

In that class of cases, the rule is strict that the carrier warrants the passengers that his vehicle is equal to the journey (*Bremmer* agt. *Williams*, 1 *Carr. & P.* 414), and he is bound absolutely, and irrespective of negligence, to provide road-worthy vehicles (*Alden* agt. *N. Y. Central R. R. Co.* 26 *N. Y.* 102), and to adopt all known and tested improvements for the safety of passengers.

These cases rest upon the principle that the carriers of persons are not only bound to a very high degree of caution, and should provide, as far as human care and foresight can go, for their security, but that they absolutely *warrant* them safe conveyance.

No such principle, however, is applicable to persons standing in the relation occupied by the parties to this suit ; nor can any case be found, which makes an owner an insurer of the sufficiency of his structures. If, then, the fixture was suitable and safe, *if used with care*, no responsibility can rest upon the owner ; and if by its negligent or careless use, it is made to cause an injury, the person guilty of such negligence must be looked to for damages.

The owner of a house is not bound to adopt all new inventions or improvements, as is required by carriers of passengers. The law does not impose such a duty. Iron pipe is now much used instead of lead pipe, as conductors in buildings, because of danger of leakage from the latter through the gnawing of rats. But is every landlord bound to remove his lead pipe, and put iron pipe in its stead? To require it would make him absolutely warrant the safety and sufficiency of the lead pipe, without regard to any negligence in suffering it to be out of repair, or to go to decay.

From these views, if they are correct, it follows that the whole duty of owners towards their tenants is discharged if the water fixtures in their buildings are so constructed that in their careful use they perform the purposes of their construction. They do not warrant or insure against their negligent use, and are not liable, merely because some person, for whom they are not responsible, turned a faucet, or negligently left it open.

The submission, therefore, of any question to the jury of a supposed unsuitableness or insufficiency of the structure, was improper.

The evidence was uncontradicted, *that it was safe if used with care;* and there being no proof that the defendants left it open, or caused it to be left open, the justice should have directed a verdict for the defendants.

The order denying their motion for a new trial, should, threfore, be reversed, and a new trial ordered as to them, with costs to the appellants to abide the event.

The order denying the plaintiffs' motion for a new trial as to the defendant Mount, should be affirmed, with costs